**United States District Court**
For the Northern District of California

1

2

3

4                                                      **E-FILED on** ___5/24/12___

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

12   JOSEPH H. LANGLOIS, JR.,                    No. 11-cv-03472 RMW

13              Plaintiff,

14        v.                                     ORDER GRANTING DEFENDANT'S
                                                 MOTION FOR JUDGMENT UNDER RULE
15   METROPOLITAN LIFE INSURANCE                 52
     COMPANY,
16                                               **[Re Docket Nos. 40, 42]**
              Defendant.
17

18

19        Plaintiff Joseph Langlois ("Langlois") filed this ERISA lawsuit against his former employer,

20   defendant Metropolitan Life Insurance Company ("MetLife"), seeking long-term disability benefits

21   allegedly owed to him for the period between January 15, 2010 and March 3, 2011.  The parties now

22   move separately for judgment under Fed. R. Civ. P. 52.  After careful consideration of the

23   administrative record and supplemental reports submitted by MetLife, the court concludes that

24   Langlois has failed to prove by a preponderance of the evidence that he was disabled under the terms

25   of MetLife's employee insurance policy during the claim period.  Accordingly, the court grants

26   MetLife's motion for judgment.

27

28

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. LEGAL STANDARD

Fed. R. Civ. P. 52 provides that "[i]n an action tried on the facts without a jury … the court must find the facts specially and state its conclusions of law separately."  Unlike a Rule 56 motion for summary judgment, a Rule 52 motion seeking disability benefits requires the court to actually decide whether the plaintiff is disabled under the terms of the policy at issue.  *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).  The court must therefore evaluate the persuasiveness of conflicting testimony and make findings of fact.  *Id.*  This is considered a "bench trial on the record," which may "consist[ ] of no more than the trial judge rereading [the administrative record]."  *Id.*

# II. FINDINGS OF FACT

**A.    Employment Background**

1.    Langlois began working for MetLife as a financial services representative in 1987.  AR 60.[1] In 1998, Langlois switched his focus to "financial planning" and formed his own independent practice within MetLife.  *Id.*  Langlois' role as a financial planner required him to advise clients on a wide range of issues such as tax and investment strategies, retirement planning and insurance coverage.  AR 80.

2.    Financial planners develop close relationships with their clients.  They must have strong "interpersonal skills," including dependability, perceptiveness, and the ability to listen and communicate effectively.  AR 82.  Such skills are also important in acquiring new clients through sales presentations or networking.  AR 80.  In addition, financial planners need analytical skills in order to process complex financial information and provide competent advice.  AR 82.

3.    By the late 2000s, Langlois had a client base of about 1,000 actively managed clients, with an overall "book of business" of about 2,700 clients.  AR 69.  By many measures, Langlois was one of MetLife's top-performing financial planners in the country.  AR 61.

**B.    Employment Conflicts and the Onset of Langlois' Alleged Disability**

---

[1]    Citations to "AR" refer to the administrative record as provided by Langlois.  The court has eliminated any superfluous zeroes in its citations.  For example, the page that is Bates-stamped "LANGLOIS000060" is cited as "AR 60."

**United States District Court**
For the Northern District of California

4.       In spite of Langlois' strong job performance, he experienced "difficulties" with MetLife management as early as 2002. AR 62. He had an adversarial relationship with a particular manager in the firm's San Diego office between 2002 and 2005, and was frustrated by MetLife's decision to settle certain "customer disputes" in the customers' favor despite his assertions of innocence. *See id.*; AR 167. During this time, Langlois often felt stressed and anxious, but did not seek medical help because he "thought those feelings would pass." AR 62.

5.       In August 2009, MetLife began to increase its supervision of Langlois' practice. AR 167. The increased supervision subjected Langlois to greater oversight, monitoring and control by MetLife and restricted the autonomy of his practice. *Id.* The added scrutiny also caused Langlois stress and anxiety. AR 62.

6.       On October 20, 2009, Langlois had a "meltdown" at work during which he cried in front of several MetLife employees. AR 63. The same day, Langlois sought urgent care treatment from Dr. Gordon Booth. AR 98. Langlois reported shortness of breath, chest tightness, insomnia and "extreme stress over situations at his company at this time." *Id.* Dr. Booth conducted a chest x-ray, which did not reveal any abnormalities. *Id.* Dr. Booth diagnosed Langlois with "panic disorder, anxiety reaction and transient situational disorder," and prescribed Ativan for anxiety control. AR 99.

7.       On December 4, 2009, Langlois began weekly treatment with Dr. Rodrigo Munoz, a board-certified psychiatrist and Clinical Professor of Psychiatry at the University of California at San Diego. AR 106-07. Dr. Munoz diagnosed Langlois with depression and anxiety, which the doctor noted were "triggered" by work-related conflicts. *Id.* Dr. Munoz continued Langlois' prescription for Ativan, and recommended that Langlois take antidepressants. *Id.* Langlois refused because he feared the medication would cause adverse effects related to his recent gastric bypass surgery. *Id.*

8.       Later that month, Langlois found out that he did not receive the MetLife Financial Planner of the Year award, which he had expected to receive because he had the most "points." AR 63. Langlois worried that not receiving the award would reflect poorly on him in the eyes of his co-workers, which added to his feelings of stress and anxiety. *Id.*

9.       On January 8, 2010, Langlois visited the Metro Comprehensive Medical center after

United States District Court
For the Northern District of California

1   experiencing heart palpitations.  AR 146.  The treating physician noted that Langlois reported

2   "moderate duress with work" and manifested "features of anxiety and acute stress response," but that

3   he denied "regularly feeling down" or having suicidal thoughts.  AR 146-47.

4   10.     On January 14, 2010, MetLife informed Langlois that his practice was to be placed under an

5   "enhanced supervision monitoring plan."  AR 63-64; AR 167.  As part of the plan, Langlois would

6   be required to move from his independent practice into a more traditional practice within MetLife.

7   *Id.*  Langlois stated that "having been on enhanced supervision in 2004 and 2005, I knew about the

8   stress and anxiety that it would put on me and my entire firm."  AR 64.  According to Langlois, this

9   was the "tipping point" in the development of his stress and anxiety-related symptoms.  AR 64.

10  11.     After being notified of MetLife's intent to implement the enhanced supervision plan,

11  Langlois immediately left his office and sought treatment for chest pain from his primary care

12  physician, Dr. Gilbert Dominguez.  AR 150-52.  Dr. Dominguez noted that "most of [Langlois']

13  symptoms are related to the current stress from his job situation.  Rather than place patient on daily

14  antidepressant, will try very low dose beta blocker to try and normalize blood pressure … when he

15  gets angry at work."  AR 15.

16  **C.     Initial Disability Benefits Claims**

17  12.     Following his January 14, 2010 departure, Langlois did not return to work at MetLife for

18  more than a year.  Instead, he initiated claims for Individual Disability Insurance, short-term

19  disability ("STD") benefits and Family and Medical Leave Act ("FMLA") benefits.

20  13.     On January 20, 2010, Dr. Munoz submitted a form in connection with Langlois' claims

21  indicating that Langlois was "severely anxious-depressed – unable to think or concentrate - unable to

22  make decisions."  AR 104.  Dr. Munoz further stated that the probable duration of Langlois'

23  condition was "indefinite at this time."  AR 103.

24  14.     On January 28, 2010, MetLife granted Langlois STD benefits until the end of March 2010.

25  MAR 16.[2]

26  _____

27  [2]     Citations to "MAR" refer to the MetLife Administrative Record, which appears to contain the
    many of the same materials as the Administrative Record provided by Langlois but in a different order.
    Where Langlois did not provide materials relevant to the court's resolution of this case, the court refers

28  to the pages as they are listed in the MAR.

United States District Court
For the Northern District of California

15.     In late March and early April 2010, MetLife sent several requests to Dr. Munoz seeking updated information on Langlois' condition, including office visit notes, objective exam findings, a treatment plan, diagnostic test results, and rehabilitation and progress notes.  *See* MAR 29; 36.

16.     On April 6, 2010, Dr. Munoz sent a letter to MetLife, noting that Langlois had only given him permission to respond to questions associated with the date on which Langlois could return to work.  MAR 604.  He very briefly summarized his treatment, stating that "Mr. Langlois has seen me because of a major depression, a single episode, related to distress caused by conditions at work." AR 153.  Dr. Munoz concluded that Langlois continued to have problems with concentration and decision-making that would prevent him from working until the end of September 2010.  *Id.*

17.     Langlois also received treatment from Dr. Dominguez for swollen lymph nodes twice in the spring of 2010.  Dr. Dominguez' notes indicate that during both visits, Langlois was alert, displayed an "appropriate affect and demeanor" and that he was "under stress at work and taking his medications as directed for anxiety without any problems."  AR 541-45.

**D.     Long-Term Disability Benefits Claim and the MetLife Plan**

18.     On May 27, 2010, Langlois opened a long-term disability ("LTD") benefits claim.

19.     Under the relevant terms of the MetLife employee insurance plan (the "Plan"), an employee suffers from a long-term disability if "during the first 18 months of disability ... , including the period of short term disability," he is unable to earn more than 80% of his pre-disability income at his "own occupation" for any employer in the "local economy."  AR 34.  The employee's loss of earnings must be a result of his "sickness."  *Id.*

20.     In connection with his LTD claim, Langlois submitted a largely blank Personal Profile in which he responded "N.A." to most questions.  MAR 564-68.  In response to inquiries about his medical condition, Langlois simply stated: "See Dr. Munoz letter at STD dept."  MAR 564.  When asked if he could return to work if his employer made reasonable accommodations, Langlois responded "No!"  MAR 567.  For his expected return to work date, Langlois listed "unknown at this time."  *Id.* Langlois also submitted an Employee Statement, in which he classified his condition as a "work-related" illness and referred MetLife to Dr. Munoz and Dr. Dominguez for medical information requests.  MAR 558-60.

United States District Court
For the Northern District of California

21.     On June 1, 2010, Dr. Eric Kaplan, a MetLife consultant, spoke to Dr. Munoz about Langlois' ongoing treatment.  Dr. Munoz began the conversation by stating that it was a "complicated case" with a "high potential for litigation."  MAR 526.  Dr. Munoz also indicated that he had received a letter from Langlois' attorney stating that he did not have permission to release Langlois' medical records.  *Id.*  He told Dr. Kaplan that Langlois' psychiatric problems began after his employer took "some type of corrective action … against him," and that he was "obsessed with the situation with his employer."  AR 159.  Dr. Munoz had not conducted any psychological or psychiatric testing on Langlois, but observed that the patient was "having variable moods, depressed at times, optimistic other times."  AR 159-60.  Langlois also experienced "social isolation" and was "embarrassed to be around people that he worked with as he was not invited to some type of work-related celebration which he felt entitled to have been invited."  *Id.*  Langlois was still having difficulty focusing and making decisions but had not experienced a change in appetite, psychosis or suicidal ideation.  *Id.*

22.     On June 2 and July 2, 2010, MetLife again wrote to Dr. Munoz seeking medical records, diagnostic test results and treatment notes.  *See* MAR 533-36.  In response, Dr. Munoz provided a short declaration reiterating his opinion that Langlois suffered from "severe depression and anxiety disorder" which rendered him unable to perform the duties of his occupation.  MAR 515.  On July 9, 2010, MetLife informed Langlois that it could not complete its evaluation of his claim without Dr. Munoz' medical records.  MAR 528.

23.     At some point in July 2010, MetLife discontinued Langlois' STD benefits.

24.     On August 5, 2010, MetLife sent a letter to Langlois requesting that he submit to an Independent Medical Evaluation ("IME"), and indicating that if an IME was not completed by August 26, 2010, it would assess his claim for LTD benefits "with the information currently contained in your file."  MAR 511.

### 1.     MetLife's Independent Medical Evaluation

#### i.     Assessment of Dr. Travis Fogel

25.     On August 9 and 10, 2010, Dr. Travis Fogel, a board-certified neuropsychologist with Loma Linda University Health Care, conducted an IME of Langlois at MetLife's request.  AR 127.

26.     The IME consisted of a five-hour clinical interview and eight hours of neuropsychological

United States District Court
For the Northern District of California

1    tests on two consecutive days.  AR 133.  Dr. Fogel also reviewed letters from Drs. Kaplan and

2    Munoz.  AR 127.

3    27.      In a 38-page report describing the results of the IME, Dr. Fogel noted that Langlois was

4    generally "alert" and "attentive," but that he became agitated when discussing his disability claim

5    and work at MetLife.  AR 133-34.  For example, during his interview, Langlois "expressed

6    continued astonishment and disbelief over the recent and proposed changes in his work environment

7    and over the reported increased scrutiny over his business."  AR 132.

8    28.      Dr. Fogel also stated that while Langlois reported a number of cognitive problems, including

9    a decline in his memory, ability to concentrate and processing speed, "on comprehensive

10   neurological testing, ... Langlois' performance was within normal limits across all cognitive

11   domains."  AR 171-72; AR 187.  In addition, Langlois acknowledged that his cognitive complaints

12   resulted "chiefly" from work-related problems.  AR 172.

13   29.      Dr. Fogel further observed that Langlois described having an "active social life," including a

14   recent two-week trip to Mexico and two separate social engagements—a birthday party and poker

15   night—during the evenings following the IME sessions.  AR 182.

16   30.      The IME included administration of two "self-report" tests for depression, the Hamilton

17   Depression Inventory ("HDI") and Minnesota Multiphasic Personality Inventory ("MMPI").  AR

18   183.  After reviewing the results of these tests, Dr. Fogel indicated: "Mr. Langlois does not meet the

19   DSM-IV criteria for Major Depression.  More specifically, Mr. Langlois meets just 1 of the 9 criteria

20   or symptoms … well below the required cutoff of 5 or more symptoms.  Furthermore, the one

21   criterion that he met (i.e. diminished ability to think or concentrate or indecisiveness, nearly every

22   day) was not one of the two required symptoms (namely, depressed mood or loss of pleasure)."  AR

23   186.

24   31.      In response to a prompt regarding Langlois' motivation to return to work as a financial

25   services representative, Dr. Fogel concluded:

26          Mr. Langlois would appear very motivated to return to work as a financial services
           representative were he able to return to his business operations from prior to the
27         increased scrutiny, supervision, monitoring and oversight he began to experience.
           Put another way, Mr. Langlois appears very motivated to work as a financial services
28         representative, but not motivated to return to his current position with his current
           employer … Mr. Langlois stated this fairly forcefully when he said, "If I walk into

1   that office, I die." … Mr. Langlois noted that previously had plans to retire in 2014
2   when he could have "maxed" his benefits and for his son (who works in his office) to
    take over his practice, adding, "I thought I would do it on my terms."  Mr. Langlois
3   made it clear … that he was unwilling and refused to work in his current work
    environment with its current and proposed restrictions and limitations and its
4   associated financial repercussions … However, Mr. Langlois' decision not to work is
    by choice and not due to a disabling neuropsychological condition.  AR 191.

5   ### ii.    Assessment of Dr. Eric Kaplan

6   32.    On September 13, 2010, Dr. Kaplan reviewed Dr. Fogel's IME findings on behalf of MetLife.

7   33.    Dr. Kaplan noted that Langlois had expressed a number of subjective complaints, including:

8   "Gets tired and depressed easily, increased forgetfulness, struggles finding words, feeling less

9   sharp." AR 204.  However, Dr. Kaplan indicated that the HDI and MMPI assessments did not

10  support a diagnosis of depression or generalized anxiety disorder.  *Id.*  Dr. Kaplan concluded that the

11  "findings do not support significant psychiatric symptoms" and that Langlois "did not exhibit any

12  behaviors during the evaluation that would offer support for his self-described cognitive

13  complaints." AR 204-05.

14  34.    Dr. Kaplan also noted that "there is substantial evidence that secondary gains [i.e., financial

15  or emotional benefits derived from malingering or symptom exaggeration] have a significant impact

16  on the claimant's disability claim." AR 205; AR 216.

17  ### 2.    Denial of Langlois' LTD Claim

18  35.    MetLife denied Langlois' LTD claim on September 29, 2010.  AR 79.

19  36.    In its denial letter, MetLife explained that the results of its independent evaluation did not

20  support a finding that Langlois' condition prevented him from working.  The letter stated: "On the

21  comprehensive neuropsychological testing, your overall performance was within normal limits

22  across all cognitive domains, including general intelligence, memory, language and executive

23  functioning.  During the examination, you were not observed demonstrating any behaviors that

24  would support your self-described cognitive complaints.  Additionally, the examination findings do

25  not support any psychiatric symptoms, cognitive dysfunction or impairment to your daily activities."

26  AR 22.

27  ### E.    Langlois' Administrative Appeal

28  37.    Langlois appealed Metlife's denial of LTD benefits on March 4, 2011.  AR 1.  Around the

1    same time, he returned briefly to work at MetLife, but did not stay.  MAR 132.  His appeal therefore

2    sought LTD benefits only for the period between January 14, 2010 and March 3, 2011.[3]

3    38.      In support of his appeal, Langlois submitted a letter from Dr. Munoz, a medical evaluation

4    challenging the results of MetLife's IME, a report from a vocational consultant, and declarations

5    from several of his co-workers.

6            **1.      Letter from Dr. Munoz**

7    39.      In a two-page letter summarizing Langlois' treatment, Dr. Munoz indicated that he had seen

8    Langlois on a weekly basis between December 4, 2009 and March 1, 2011.  He opined that Langlois

9    suffered from "severe anxiety and depression."  AR 106.  He noted that Langlois' condition impaired

10   his relationships with his son, his fiancee and his parents, and that his "social isolation" also made it

11   difficult for him to function successfully in business relationships.  *Id.*  Dr. Munoz further observed

12   that Langlois "constantly has trouble focusing, remembering and making decisions."  *Id.*  He

13   indicated that Langlois' depression "worsened significantly" in the fall of 2010 and that he had

14   expressed thoughts of suicide in October 2010.  AR 107.  At that point, Dr. Munoz prescribed the

15   antidepressant Lexapro, which the doctor insisted Langlois take regardless of his concerns about

16   gastrointestinal problems.  *Id.*  Dr. Munoz concluded that between January 2010 and March 2011,

17   Langlois' "depressed affect, lethargy, lack of concentration, difficulties with interpersonal

18   relationships and other symptoms of depression and anxiety rendered him totally unsuitable" for

19   work as a financial planner between January 2010 and March 2011.  AR 107.  Dr. Munoz' letter did

20   not include additional treatment notes, diagnostic test results or other medical records.

21           **2.      Assessment of Dr. McDonough Challenging MetLife's IME Findings**

22   40.      On February 16, 2011, Dr. Mark McDonough, a neuropsychologist at Scripps Hospital,

23   prepared a report summarizing a session he had held with Langlois on October 14, 2010.  *See* AR

24   206-219.

25   41.      Dr. McDonough's report was highly critical of the reports prepared by Drs. Fogel and

26   Kaplan.  Specifically, Dr. McDonough noted that Dr. Fogel's report included forty factual errors in

27   

28   _____
     [3]      It is not entirely clear why Langlois seeks LTD benefits for the period from January 2010 through July 2010, when it is undisputed that he received STD benefits.  As the court's resolution of the present motions does not turn on this issue, it will not address it here.

United States District Court
For the Northern District of California

1   its background history section.  Of particular significance were mistakes regarding the large amount

2   of the monthly disability payments allegedly owed to Langlois and Langlois' plans to retire, which

3   Dr. McDonough opined "may have skewed [Dr. Fogel's] thinking as he interpreted the test data"

4   towards false conclusions regarding secondary gains or Langlois' motivation to return to work.  AR

5   207.

6   42.      Dr. McDonough also felt that Drs. Fogel and Kaplan placed undue weight on Langlois'

7   "innocuous" references to planned social activities.  AR 208.  As Dr. McDonough explained, the fact

8   that Langlois engaged in social activities did not mean that he approached such activities without a

9   loss of energy, and thus did not necessarily support a conclusion that Langlois was not depressed.

10  AR 208-10.

11  43.      In addition, Dr. McDonough critiqued Dr. Fogel's administration of the HDI and MMPI tests

12  and his interpretation of their results.  First, Dr. McDonough observed that Dr. Fogel atypically

13  administered the MMPI by recording Langlois' responses himself rather than allowing Langlois to

14  record his own responses.  AR 214.  Dr. McDonough indicated that this approach could have

15  "unknown effects." *Id.* Second, Dr. McDonough opined that Dr. Fogel focused disproportionately

16  on the HPI test over the MMPI.  AR 213.  Third, Dr. McDonough observed that Dr. Fogel's report

17  highlighted scores that fell below the cutoff for clinical depression, but discounted or ignored scores

18  that were above the cutoff.  AR 211.

19  44.      Dr. McDonough also administered his own MMPI test.  Although Langlois was asked to

20  "answer in the way he had during the first assessment," the results of this evaluation showed a

21  significantly higher incidence of depressive symptoms than the test administered by Dr. Fogel two

22  months earlier.  *See* AR 217-19.

23  45.      Dr. McDonough did not conduct any additional cognitive testing or address the results of Dr.

24  Fogel's cognitive testing in his report.

25  46.      Dr. McDonough concluded that the reports prepared by Drs. Fogel and Kaplan suffered from

26  "pervasive flaws" and ignored "significant evidence of [Langlois'] depression and anxiety."  AR 219.

27  He further indicated that MetLife's experts' opinions that Langlois was motivated by secondary gains

28  were "reckless" and unsubstantiated by corroborating data.  AR 217.

United States District Court
For the Northern District of California

### 3.     Report from Vocational Consultant Douglas Gorman

47.     On March 3, 2011, Douglas Gorman, a "vocational consultant," prepared a report in which he assessed Langlois' ability to work as a financial planner.

48.     Relying primarily on the evaluations of Drs. Munoz and McDonough, Mr. Gorman opined that "depression and anxiety adversely impacted [Langlois'] cognitive capacities essential to the quality and detail-rich necessities of the financial planning and plan-maintenance process." AR 86. Mr. Gorman also found that Langlois' social isolation resulted in an "incapacity for building and maintaining complex and close business relationships indispensable to a successful financial planning/advising practice." *Id.*

49.     Mr. Gorman concluded that as a result of Langlois' psychological condition, he was unable to earn more than 80% of his pre-disability earnings as a financial planner in his local economy. AR 86-87.

### 4.     Co-Worker Declarations

50.     Three of Langlois' MetLife co-workers, Laura Szymanski, Kyle Farmer and Caroyln Keltner, submitted declarations indicating that they had seen a significant deterioration in Langlois' mood, energy-level and cognitive abilities leading up to his departure from MetLife in January 2010. *See* AR 91-97.

51.     Two of the co-workers also briefly described contact they had with Langlois following his departure. Laura Szymanski said that she spoke regularly with Langlois after he left MetLife, and that there is "no fire in him anymore." AR 97. Kyle Farmer indicated that he had seen Langlois a "number of times" since January 2010, and that he is "definitely not the same guy right now that he used to be." AR 95. Farmer further noted that "the difficulties [Langlois] has been having with MetLife have been devastating for him. I have seen him cry when he starts to talk about it." *Id.*

52.     MetLife failed to render a decision on Langlois' appeal within the 90-day window required

        by

the Plan, claiming that it needed more time to submit Langlois' file to an independent physician consultant ("IPC") for review. *See* MAR 134; 119.

53.     This action was filed on July 15, 2011. Dkt. No. 1.

United States District Court
For the Northern District of California

1    **F.      IPC Evaluations of Langlois' Claim**

2          **1.      Assessment of Dr. Catherine Leveroni**

3    54.    Despite the initiation of litigation, MetLife continued to pursue IPC evaluations of Langlois'

4    claim.  The first such assessment was conducted by Dr. Catherine Leveroni, a clinical

5    neuropsychologist at Harvard Medical School, who reviewed Langlois' file in its entirety and

6    prepared a report dated July 21, 2011.  MAR 991.

7    55.    Dr. Leveroni disagreed with Dr. McDonough's critique of Dr. Fogel's decision to rely on the

8    HDI rather than the MMPI.  According to Dr. Leveroni, while the MMPI test is a more

9    comprehensive test, the HDI is more focused on depressive symptoms and is thus "widely

10   considered the gold standard for measuring depression in psychiatry."  MAR 998.

11   56.    Dr. Leveroni also stated that the differences between Langlois' responses on the MMPI tests

12   administered by Dr. Fogel and Dr. McDonough "suggested exaggeration of symptoms for the

13   purposes of secondary gain."  *Id.*

14   57.    In addition, Dr. Leveroni noted that Langlois' anxiety and panic are "circumscribed to his

15   work situation and do not transfer to other settings."  *Id.*  She also observed that while Dr. Munoz'

16   letters inidcated that Langlois has "severe depression … [his] treatment plan is more consistent with

17   mild than severe depression and anxiety."  *Id.*  Specifically, Dr. Leveroni noted that Langlois' low

18   dose antidepressant prescription and lack of additional medications, inpatient hospitalization or

19   supplemental psychotherapy called into question Dr. Munoz' diagnosis.  *Id.*

20   58.    In conclusion, Dr. Leveroni opined that Langlois' intellectual, cognitive, and social abilities

21   were sufficient during the claim period to enable him to perform his job.  However, she noted that

22   his depressive symptoms could affect his capacity to function and that "reasonable

23   accommodations," including a reduction to part time work, might be appropriate.  MAR 999.

24         **2.      Assessment of Dr. Martin Kelley**

25   59.    The second IPC evaluation was conducted by Dr. Martin Kelley, a Professor of Psychiatry at

26   Harvard Medical School, who also reviewed the administrative record in its entirety and prepared a

27   report dated September 7, 2011.  MAR 973.

28

60.     Dr. Kelley noted that Dr. Munoz' refusal to release detailed treatment records made a complete evaluation of Langlois' case difficult.  MAR 975-76.  Dr. Kelley indicated that Dr. Munoz had told him over the phone that Langlois had "fears about information from his medical records being released to [MetLife]."  MAR 973-74.

61.     Dr. Kelley criticized Dr. McDonough's report, opining that the fact that Langlois was able to identify forty specific errors in Dr. Fogel's report was evidence of Langlois' mental competence, and thus "perhaps inadvertently" undermined Dr. McDonough's conclusions.  MAR 975.  Further, after reviewing Dr. McDonough's raw data, Dr. Kelley questioned whether the substantial differences between the results of Dr. McDonoguh's MMPI test and the test administered by Dr. Fogel were a consequence of the latter doctor's errors or the former's.  *Id.*

62.     Dr. Kelley next stated:

> Though there is some issue because Mr. Langlois refuses to make his records available for review, it is clear from what is available that he operates very successfully in his self-interest.  That is manifested even in his limiting Dr. Munoz' accessibility and release of his psychiatric records.  [Further, in testing with both Drs. Fogel and McDonough] it is very clear that Mr. Langlois fully understands his situation, operates in a sophisticated manner to protect himself, and displays no cognitive symptoms or symptoms of a psychiatric disorder that would render him unable to function in his previous position if he were motivated to do so.  MAR 976.

63.     Dr. Kelley concluded that while Langlois may not have been able to work full time for a period of days or weeks in January 2010, there was no evidence of long-term disability.  *Id.*

64.     On September 14, 2011, MetLife informed Langlois' counsel that it had obtained IPC evaluations of Langlois' file.  MAR 964.  MetLife included copies of the supplemental reports and invited Langlois to respond.  *Id.*  Langlois' counsel replied that as such materials were not part of the administrative record, they could not be considered with Langlois' appeal.  MAR 962.  Langlois therefore did not forward the supplemental reports to Dr. Munoz for review or otherwise respond to their contents.

65.     MetLife never issued a decision on Langlois' administrative appeal.  *See* Dkt. No. 35.  Consequently, on December 16, 2011, the court determined that it would review MetLife's initial decision to deny Langlois' LTD benefits claim *de novo*.  *Id.*

### III. ANALYSIS

**A.     Consideration of the IPC Reports**

United States District Court
For the Northern District of California

1    As a threshold matter, the parties dispute whether the court may consider the IPC reports

2    because they were prepared after the initiation of litigation and are thus not part of the administrative

3    record.  In reviewing a denial of benefits *de novo*, the court is not limited to the record before

4    the plan administrator.  *Jebian v. Hewlett-Packard Co. Emple. Benefits Org. Income Prot. Plan*, 349

5    F.3d 1098, 1110 (9th Cir. 2003).  However, "the district court should exercise its discretion to

6    consider evidence outside of the administrative record *only* when circumstances *clearly establish*

7    that additional evidence is necessary to conduct an adequate de novo review of the benefit decision."

8    *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007) (emphasis in

9    original) (internal citations and quotation marks omitted).  Such circumstances may include claims

10   that raise issues regarding the credibility of medical experts.  *Id.*

11   While it is a close question, the court concludes that consideration of the IPC reports is

12   necessary to conduct an adequate de novo review of the benefit decision because Langlois' claim

13   involves substantial issues regarding expert credibility.  First, by relying heavily on Dr.

14   McDonough's report, Langlois has raised a serious question as to the reliability of MetLife's medical

15   experts.  *See* Dkt. No. 42 at 16-18; Dkt. No. 48 at 8-11.  Indeed, Dr. McDonough's report is devoted

16   *entirely* to critiquing the methodology, precision and conclusions of Drs. Fogel and Kaplan.  Even

17   Dr. McDonough's administration of the MMPI, which Langlois calls "significant evidence of [his]

18   depression and anxiety," Dkt. No. 48 at 7, was targeted towards undermining Dr. Fogel's credibility,

19   since Dr. McDonough asked Langlois to "answer in the way he had during the first assessment"

20   rather than simply conducting his own evaluation.  AR 215.  This case thus falls "squarely within the

21   first example cited in *Opeta*."  *Reynolds v. UNUM Life Ins. Co. of Am.*, No. 10-2383, 2011 U.S. Dist.

22   LEXIS 90314, at *3 (D. Ariz. Aug. 12, 2011) (granting request for discovery of supplemental

23   evidence of  bias on the part of insurer's expert where plaintiff had raised an issue regarding his

24   credibility); *Knopp v. Life Ins. Co. of N. Am.*, No. 09-0452 CRB (EMC), 2009 U.S. Dist. LEXIS

25   120267, at *8 (N.D. Cal. Dec. 28, 2009) ("The Court concludes that Ms. Knopp has made an

26   adequate showing that she is entitled to some discovery which could bear directly and substantially

27   on the credibility of the medical reviewers engaged by the insurer.").

28   In addition, because  the only medical professionals to have contact with Langlois during the

United States District Court
For the Northern District of California

1  claim period–Drs. Munoz, Fogel and McDonough–reached directly conflicting conclusions,

2  resolution of this case turns largely on an assessment of the credibility of each expert.  The parties

3  have elected to have this case decided on the record, and thus there has been no opportunity to

4  observe the experts in person.  Consequently, the court is ill-equipped to evaluate their credibility

5  without looking to supplemental evidence.  *See Duncanson v. Royal & SunAlliance Group Life Ins.*

6  *Policy*, No. 10-02898 JSW, 2011 U.S. Dist. LEXIS 136792, at *10-11 (N.D. Cal. Nov. 29, 2011)

7  (concluding on a Rule 52 motion that "because there is conflicting medical evidence in the record ...

8  [extrinsic] evidence relating to the credibility of Dr. Dell is necessary to conduct an adequate de

9  novo review of the benefits decision"); *compare Callow v. Prudential Ins. Co. of America*, No. 07-

10  1247, 2009 U.S. Dist. LEXIS 47737, at *8 (W.D. Wash. May 21, 2009) (denying motion to allow

11  claimant to supplement the record with live testimony and noting that "*should the Court find any*

12  *actual conflicts* between their opinions, it shall consider the thoroughness of the evaluation and

13  report in determining how much weight to accord any expert's opinion") (emphasis added).

14           Further, it is clear that the IPC reports "bear[] directly and substantially" on the credibility of

15  the parties' experts.  *Knopp*, 2009 U.S. Dist. LEXIS 120267, at *8.  For example, Dr. McDonough

16  attacked Dr. Fogel's "non-empirical conclusions" and reliance on the HDI over the MMPI,

17  suggesting bias in favor of the insurer, while the IPC explained why the HDI was the more

18  appropriate measure of Langlois' symptoms under the circumstances.  Similarly, Dr. McDonough

19  called MetLife's experts' opinion that Langlois was motivated by secondary gains "reckless" and

20  "unsubstantiated," AR 217, but both IPCs reached the same conclusion after reviewing the raw data.

21  Dr. Leveroni's IPC report also explicitly questioned Dr. Munoz' reliability, noting that his treatment

22  regime was inconsistent with his diagnosis of severe depression.  Supplemental materials are

23  particularly helpful in evaluating Dr. Munoz' credibility because his evaluation is both cursory and

24  lacking in supporting records or explanation.  *See Muniz v. Amec Constr. Mgmt.*, 623 F.3d 1290,

25  1298 (9th Cir. 2010) (district court did not abuse its discretion in ordering and considering the

26  results of an independent medical examination where the claimant's treating physician's records were

27  "inconsistent and incomplete").

28           Finally, although it is true, as Langlois' counsel noted at oral argument, that the supplemental

ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT UNDER RULE 52
No. 11-cv-03472 RMW
EDM                                                                15

United States District Court
For the Northern District of California

materials give MetLife the "last word" on this claim, the court is not concerned that Langlois has been "sandbagged by a rationale the plan administrator adduces only after the suit has commenced." *Jebian*, 349 F.3d at 1104.  In fact, MetLife explicitly invited Langlois to review and respond to the IPC reports more than six months before submitting this motion, but Langlois refused to do so.  *See Muniz*, 623 F.3d at 1298 (no abuse of discretion where claimant was given an adequate opportunity to challenge the supplemental report).  Moreover, the supplemental reports do not offer any additional basis for denying Langlois' claim; they merely evaluate the materials already in the record.  MetLife's position remains largely unchanged from the explanation laid out in its denial letter: that Langlois's "self-described" symptoms of disability are contradicted by the more "objective" evaluation conducted by Dr. Fogel.  *Compare Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008) ("The district court must give Saffon an opportunity to present evidence on the one issue that was *newly raised* by MetLife in its denial letter–the results of a Functional  Capacity Evaluation or other objective evidence of whether she is totally disabled under the terms of the Plan.") (emphasis added).  Given that Langlois has had notice of MetLife's position since September 29, 2010, it is reasonable to infer that if he had any additional evidence supporting his claim–such as Dr. Munoz' treatment notes or the results of other diagnostic testing–he would have produced it.  The court thus concludes that the supplemental reports may be considered in determining whether MetLife properly denied Langlois' claim.[4]

**B.      Denial of Benefits**

In an ERISA action, the plaintiff carries the burden of showing, by a preponderance of the evidence, that he was disabled under the terms of the Plan during the claim period.  *Oster v. Std. Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. 2011).  Langlois must therefore establish that as a result of his depression and anxiety, he was unable to earn more than 80 percent of his previous income by working as a financial planner for any employer in his local economy throughout the entire period from January 15, 2010 to March 3, 2011.  AR 24.

_____

[4]      Contrary to Langlois' argument, MetLife's previous assertion that the materials produced before litigation constituted the "entire Administrative Record," *see* Dkt. No. 31-1, does not estop it from submitting supplemental materials which it plainly acknowledges are *not* part of the administrative record.  *See Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 917 (9th Cir. 2001) ("[Judicial estoppel] bar[s] a party from making a factual assertion in a legal proceeding which *directly* contradicts an earlier assertion made in the same proceeding.") (emphasis added).

United States District Court
For the Northern District of California

In support of his position, Langlois relies primarily on the letter submitted by Dr. Munoz indicating that Langlois suffered from "severe" depression and anxiety, rendering him incapable of functioning as a financial planner throughout the claim period.  AR 106.  Langlois emphasizes that financial planning requires substantial interpersonal and analytical skills, and thus that the cognitive and social issues associated with depression and anxiety were especially disabling for an individual in his position.  The court gives Dr. Munoz' opinion some credence because he is Langlois' treating physician and the only medical professional who maintained a relationship with Langlois for the entire period at issue.  However, courts are not required to "accord special weight to the opinions of a claimant's physician" and may "credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  As discussed below, in light of the substantial evidence contradicting the Dr. Munoz' conclusion, the court finds that Langlois has failed to meet his burden to show he suffered from a long-term disability.

First, the court finds extremely persuasive Dr. Fogel's opinion that at least by the summer of 2010, Langlois was capable of working as a financial planner, but either unwilling or unable to return to MetLife.  First, there is no question that Langlois' condition was "triggered" by MetLife's decision to increase supervision of his practice.  AR 106.  In addition, there is significant evidence that Langlois' symptoms remained closely intertwined with his "situation" at MetLife throughout the claim period.  Dr. Munoz acknowledged in April 2010 that Langlois' condition was "a single episode related to distress caused by conditions at work" and that Langlois was still "obsessed with the situation with his employer" two months later.  AR 159; 153.  Dr. Leveroni also opined that Langlois' symptoms were "circumscribed to his work situation and do not transfer to other settings." MAR 998.  Langlois' co-worker Kyle Farmer similarly highlighted Langlois' "difficulties" with MetLife as the root of his condition.  AR 95.  Even Langlois himself conceded that his complaints resulted "chiefly" from work-related problems.  AR 172.  Of course, as Langlois argues, it is the extent of his illness that matters, not its cause.  Nevertheless, the undisputed fact that Langlois' symptoms were so intimately related with his circumstances at MetLife strongly suggests that they did not preclude him from working elsewhere.

This conclusion is bolstered by evidence that Langlois' condition improved shortly after he

United States District Court
For the Northern District of California

1    left MetLife in January 2010.  For instance, while Langlois went to the hospital for anxiety-related

2    symptoms three times in the months leading up to his departure, he reported no similar visits after

3    January 2010.  In fact, when Langlois was treated in March and May 2010 for lymph node problems,

4    Dr. Dominguez specifically noted that he was alert, attentive and taking anxiety medication "without

5    any problems."  MAR 541-45.[5]  Dr. Kelley agreed that Langlois improved after leaving MetLife,

6    opining that Langlois may have been disabled for "days or weeks" in January 2010, but did not

7    suffer from a long-term disability.  MAR 976.  The co-worker declarations also focus

8    overwhelmingly on Langlois' symptoms before leaving MetLife; to the extent that they refer to any

9    later period, they are too vague to prove that Langlois suffered from a genuine disability.  Further,

10   while Dr. Munoz called Langlois "severely anxious-depressed" in January 2010, he observed that

11   Langlois had "variable moods" by June 2010.  AR 104; AR 159-60.  Although a claimant who has

12   "good days and bad days" may be sufficiently disabled to merit an award of benefits, Dr. Munoz did

13   not explain how long Langlois' sporadic periods of depression lasted, making it impossible to

14   determine whether his condition would have prevented him from working at that time.  *Compare*

15   *Thivierge v. Hartford Life & Accident Ins. Co.*, No. 05-0163 CW, 2006 U.S. Dist. LEXIS 25216, at

16   *35-36 (N.D. Cal. Mar. 28, 2006) (finding plaintiff disabled by chronic fatigue syndrome where her

17   "bad days" were unpredictable and could last for up to two weeks).  Ultimately, evidence of

18   Langlois' revival in the spring and summer of 2010 implies both that his condition was directly

19   connected to the environment at MetLife and that he could have returned to work for a different

20   employer if he had wanted to.

21         Langlois argues that evidence that his depression "worsened significantly" in the fall of  2010

22   belies the contention that he improved after leaving MetLife.  AR 107.  However, the court finds

23   such evidence questionable given the reasons to believe that Langlois was motivated by secondary

24   gains.  First of all, the timing is suspect: Langlois' first "suicidal ideations" and substantially

25   increased MMPI score came just after MetLife denied his claim for benefits.  While it is possible

26

27   _____
     [5]       The court affords Dr. Dominguez' notes additional credibility as they appear to be the *only*
28   documentation in the record that was not prepared to support either party's position regarding Langlois'
     disability.

that his decline was unrelated to or a genuine consequence of MetLife's action, the court finds it at least as likely that Langlois embellished his illness after realizing that his benefits were in jeopardy. This conclusion was also supported by each of MetLife's experts, as well as by Langlois' refusal to release his medical records and Dr. Munoz' cryptic statement that the case had a "high potential for litigation" before MetLife had even denied his claim. Viewed as a whole, this evidence lines up with Dr. Kelley's description of Langlois as an individual who "operates very successfully in his self-interest ... [but] displays no ... symptoms ... that would render him unable to function in his previous position if he were motivated to do so." MAR 976.

Dr. Munoz' and Dr. McDonough's conclusions are also somewhat suspect in that they are based entirely on self-reported symptoms. *See Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) ("Physicians accept at face value what patients tell them about their symptoms; but insurers … must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)."). Although the Plan does not require a claimant to provide objective evidence of disability, subjective evidence of a disabling condition is inherently less reliable than objective evidence. Of course, the court is conscious that psychological disorders may not always be objectively verifiable. However, where, as here, self-reported symptoms are contradicted by testing showing Langlois to be "within normal limits across all cognitive domains," the court finds the more objective evidence to be more convincing. AR 187.[6]

Finally, as noted above, Dr. Munoz' opinion is less persuasive given its lack of supporting evidence. The only time Dr. Munoz described Langlois' symptoms in any detail—including his suicidal ideations and trouble with personal relationships—was in a two-page letter summarizing an entire year's worth of treatment. Although Dr. Munoz is not *required* to disclose confidential information about his patients, such a cursory assessment, largely devoid of dates or description of Langlois' week-to-week progress, makes it extremely difficult to find that Langlois was disabled for the entire period in question. Furthermore, the court is particularly troubled by the assertion, which

---

[6]     It is worth repeating here that while Dr. McDonough challenged Dr. Fogel's evaluation of Langlois' depressive symptoms, he did not critique the results of Dr. Fogel's cognitive tests or conduct any of his own.

United States District Court
For the Northern District of California

1   Langlois does not refute, that Dr. Munoz withheld records because of Langlois' "fears" that they

2   would get back to MetLife.  MAR 973-74.  This at least raises an inference that such materials

3   would be favorable to the insurer, and warrants further discounting of Dr. Munoz' opinion.

4

5          Accordingly, the court finds that Langlois has failed to meet his burden to show he was

6   disabled as defined by the Plan.  That is not to say that Langlois was not depressed or anxious.

7   Psychological illness is complex, often misunderstood and inherently difficult to verify, which

8   makes it a particularly inapt subject for litigation.  However, based on the evidence in the record, the

9   court cannot conclude that it is more likely than not that Langlois' symptoms prevented him from

10  earning at least 80 percent of his previous income for any employer during the claim period.

11  Therefore, Langlois has not established that he is entitled to long-term disability benefits.

12                                      **IV.  ORDER**

13         For the foregoing reasons, the court grants MetLife's motion for judgment under Fed. R. Civ.

14  P. 52.

15

16  DATED:      May 24, 2012                    _Ronald M. Whyte_

17                                             RONALD M. WHYTE
                                               United States District Judge

18

19

20

21

22

23

24

25

26

27

28